*Pro Se 1 2022*

FILED _____ LODGED
_____ RECEIVED

FEB 17 2026

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

Lee A. Slowey

_____

_____,

                            Plaintiff(s),

        v.

The United States of America;

Department of the Navy.

_____

_____,

                            Defendant(s)

**26 CV 5140 DGE**

CASE NO. _____
[to be filled in by Clerk's Office]

COMPLAINT FOR A CIVIL CASE

Jury Trial: ☐ Yes  ☒ No

## I.    THE PARTIES TO THIS COMPLAINT

A.    Plaintiff(s)

   *Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.*

| | |
|---|---|
| Name | Lee A. Slowey |
| Street Address | 2675 Mountain View Road NW |
| City and County | Silverdale, County of Kitsap |
| State and Zip Code | Washington, 98383 |
| Telephone Number | (360)-620-6427 |

*Pro Se 1 2022*

B.    Defendant(s)

    *Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.*

Defendant No. 1

| | |
|---|---|
| Name | The Honorable Pete Hegseth |
| Job or Title *(if known)* | Secretary of War |
| Street Address | 1000 Defense Pentagon, |
| City and County | Washington, |
| State and Zip Code | DC 20301 – 1000 |
| Telephone Number | (703) 692 – 7100 |

Defendant No. 2

| | |
|---|---|
| Name | The Honorable Pamila Bondi |
| Job or Title *(if known)* | United States Attorney General |
| Street Address | Office of the Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue, NW |
| City and County | Washington, |
| State and Zip Code | DC 20530 0001 |
| Telephone Number | 202-514-2000 |

Defendant No. 3

| | |
|---|---|
| Name | N/A |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

COMPLAINT FOR A CIVIL CASE - 2

*Pro Se 1 2022*

Defendant No. 4

| | |
|---|---|
| Name | N/A |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

## II.    BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be  heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(select all that apply)*

☒  Federal question:            ☐  Diversity of citizenship:
   If checked complete section A.          If checked complete section B.

Fill out the paragraphs in this section that apply to this case.

A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

FTCA. 28 U.S.C. 1346 (b).

FTCA. 28 U.S.C. 2680 (a)

Exec. Order No. 11258, 3 C.F.R. 357 (1965)

COMPLAINT FOR A CIVIL CASE - 3

*Pro Se 1 2022*

<u>Clean Water Act, 33 U.S.C. 1251-1376</u>

B.    If the Basis for Jurisdiction Is Diversity of Citizenship

     1.    The Plaintiff(s)

        a.    If the plaintiff is an individual.

The plaintiff (*name*) N/A, is a citizen of the State of (*name*) N/A.

        b.    If the plaintiff is a corporation.

The plaintiff, (*name*) N/A, is incorporated under the laws of the State of (*name*) N/A, and has its principal place of business in the State of (*name*) N/A.

    *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

     2.    The Defendant(s)

        a.    If the defendant is an individual.

The defendant, (*name*) N/A, is a citizen of the State of (*name*) N/A.  Or is a citizen of (*foreign nation*) N/A

        b.    If the defendant is a corporation.

The defendant, (*name*) N/A, is incorporated under the laws of the State of (*name*) N/A, and has its principal place of business in the State of (*name*) N/A.

Or is incorporated under the laws of (*foreign nation*) N/A, and has its principal place of business in (*name*) N/A.

    *(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

     3.    The Amount in Controversy.

The amount in controversy-the amount the plaintiff claims the defendant owes or the amount at stake-is more than $75,000, not counting interest and costs of court, because (*explain*):

COMPLAINT FOR A CIVIL CASE - 4

*Pro Se 1 2022*

The amount in controversy of $3,375,000 was partially guided by the text of the Camp Lejeune Justice Act of 2022 (CLJA) in settlement amount categories. Where the amount in controversy differs from the CLJA is centered on Plaintiff's claim of 34 approximate years of exposure, the CLJA text referred to a maximum category of 5+ years of exposure. Plaintiff will also allege intentional acts, not negligent acts, resulting in exposure causing his injury.

---

## STATEMENT OF CLAIM

1. Plaintiff (Slowey) resided continuously from July 1990, at 2675 Mountain View Road, Silverdale, Washington, a location downgrade from Naval Base Bangor (Bangor), in the Clear Creek Drainage Basin. Slowey obtained domestic water from a private well located on the property, drawing from an aquifer (Shallow Aquifer) underlying both his residence and substantial portions of Bangor. Bangor is a known aquifer recharge area for Clear Creek, and Slowey resides in a portion of the Clear Creek Drainage Basin known to contain artesian springs near his residence, in multiple directions.

2. Slowey was diagnosed with Leukemia 2016, and alleges his personal injury resulted from long-term consumption of contaminated groundwater flowing east and southeasterly through the Shallow Aquifer from multiple sources located on Bangor, towards two eastern branches of Clear Creek, a year-round stream large enough to support androgenous fish runs and having four total branches.

3. Slowey alleges two additional off-Base private properties near Luoto Road (Louto) and the Mountain View Rubble Pile (the Pile) were utilized by the Defendant, without public knowledge,

*Pro Se 1 2022*

1  as dumpsites for contaminated soils, building demolition rubble, metal and railroad rubble

2  produced by the Trident Base renovation. Included in allegation no. 3 was the subsequent 1988-

3  1989 creation of erroneous records by Defendant (Hart Crowser 1988 and Hart Crowser 1989) to

4  keep these two sites, in addition to the overall scale of Bangor contamination from public

5  knowledge. These two dump sights are claimed as additional off-Base point sources of

6  contamination contributing to Slowey's injury. Slowey specifically states in allegation no. 3, that

7  certain records and maps produced by Defendant regarding the demolition and purported on-

8  Base reburial of the Former Metallurgical Laboratory (FML), are fabrications.

9

10   The FML, a substantial structure serviced by road and rail logistics and a key structure in the

11  ammunition handling process, is claimed by the Navy to have disappeared, apparently without

12  notice, from a Base handling both conventional and nuclear weaponry in 1973. The FML would

13  later be subject of two searches in 1987 and 1993 respectively, to determine its fate, as it was a

14  mercury processing facility, with the mercury still believed to be inside, and potentially in the

15  soil beneath the structure at the time of demolition.

16   Slowey states a 1989 Superfund designation of Operable Unit 5 (OU5), and subsequent 1993

17  multi-agency agreement of no further action regarding (OU5), was an attempt to conceal the

18  actual original FML building sight on-Base, the amount of mercury present in the FML, the year

19  of the October 1974 demolition to prevent identification of the apparent contractor (Wright-

20  Boecon), specific Congressional funding request and appropriation, the actual off-Base final

21  burial site near Mountain View Rd and concealment of any health issues suffered by off-Base

22  residents who lived in close proximity the Pile in ensuing years.

23

24

*Pro Se 1 2022*

1   The Mountain View Pile has undergone substantial grade changes, and limited scavenging by

2   civilians, but remains accessible to date.  Luoto is no longer accessible and is stated by Slowey to

3   have been re-excavated over a period of several years in the 1990's in search of materials having

4   economic value. Un-useable rubble and other assorted materials were reburied onsite. Luoto is

5   described as containing large amounts of ash and other signs of burning. Slowey states that

6   incineration was a function of Bangor Base, with the earliest known small incinerator identified

7   by a photograph dated 1945 and served by a rail dock. The Navy made statements in the early

8   1970's that attempts were made to burn contaminated soil also.

9

10  4. Slowey alleges two cement culverts discharge surface and ground-water from Operable Unit

11  8, in the vicinity of Clear Creek and Mountain View Roads intersection, originating from the

12  former Base incinerator and Industrial Area respectively and are additional point sources of

13  contaminants resulting in his injury, due to the discharges entering a wetland and infiltrating to

14  the Shallow aquifer, near the intersection of Clear Creek Rd. and Mountain View Rd.

15

16  5. Slowey alleges the Bangor area has been subject to extensive geological and hydrological

17  surveys, with portions connected to the strategic importance of the Trident Program construction

18  and basing requirements. The Navy knew Bangor was an aquifer recharge area, and surrounding

19  artesian areas existed on its periphery, and was reminded of this fact by U.S. Geological Survey

20  official reports:

21

22   From Dion (1974, p.6) …" The geology and ground-water resources of the study area described

23  in reports on Kitsap County by Sceva (1957, p. 36-71) and on the Kitsap Peninsula by Molenaar

24  (1965, p. 24-50); the reader is referred to those publications for discussions of the regional

Pro Se 1 2022

1  hydrology. The ground-water conditions in the immediate vicinity of the Bangor Annex,

2  however, have not been described in detail".

3

4  Slowey states in allegation no. 5 the Navy was made aware, on or about, February 4th, 1974, by

5  the U.S. Geological Survey, that all or substantially stream flows were supplied by ground-water

6  during seasonally dry months, as disclosed in Molanaar (1965). This would have included Clear

7  Creek. Page numbers of the Molanaar (1965) report were provided to Naval officers to ensure

8  they possessed the relevant hydrological information. On or about this date, the Navy knew, or

9  should have known the inevitability of Bangor sourced ground-water migrating East/Southeast

10  towards the Clear Creek Drainage Basin and domestic wells, along its journey to the Eastern two

11  Clear Creek Branches and associated artesian springs, relevant to the future Slowey residence.

12  The Navy would not have known which specific wells had contaminants present, what future

13  well drilling and development activity would occur, and total distance said contaminants could

14  potential migrate unless an effective monitoring program was initiated.

15  6. Slowey alleges that past construction decisions by Defendant set in motion a long-chain

16  domino effect, starting in 1972, whereby Defendant is unable to accurately report past pollution

17  sources, complete number of dump sites, dumpsite locations and efforts to conceal these dump

18  sites, without exposing Defendant to liability from potential personal injury and wrongful death

19  claims by local residents. Of the possibility of additional off-Base and on-Base dump sites,

20  Slowey can offer no opinion here.

21

22  7. Slowey alleges this concealment of historical discharge of contaminants additionally impaired

23  the ability of off-Base residents such as himself, to prevent their long-term exposure to certain

24  per – and polyfluoroalkyl substances (PFAS).

COMPLAINT FOR A CIVIL CASE - 8

*Pro Se 1 2022*

RELATED CASES

Concerned about Trident et al., v. Donald H. Rumsfeld, F.2d 817 (D.C. Cir. 1977)

Daniel Starrett; Frances Starrett, v. United States of America et al, 847 F.2d 539 (9th Cir. 1988)

Priddis v. United States of America et al., 3:25 -cv-05056-DGE (U.S. District Court for the

Western District of Washington)

BANGOR SITE HISTORY AND SOURCES OF LATER SLOWEY WELL

CONTAMINATION

-1944 / 1945. Naval Base Bangor, located immediately west of Mountain View Rd., was

originally created as the Bangor Ammunition Depot, and went on to operate under various names

and command structures. On-Base activities ebbed and flowed in sync with American military

actions in the Western Hemisphere.

-1964.  The Polaris Missile Facility – Pacific (SWFPAC), was commissioned in the central

undeveloped area of Bangor, and elevated Bangor's level of Cold War Era sensitivity as a

nuclear facility.  Over the course of this timeline, in addition to the Depot's utilitarian

ammunition handling, the Base experienced three periods of massive ammunition transshipments

during three wars.  Beginning from 1945, substantial environmental contamination was

accumulating from ammunition handling in support of the Fleet, Bangor Industrial Area

activities and Bangor's side function of a waste dump.

  To establish the earliest documented effort to conceal waste from past Base activities, the

complaint will substantially focus below on a process called de-milling. While not the only

*Pro Se 1 2022*

1  source of contamination claimed by Slowey to have entered his well, it along with demolition of

2  the FML are stated by Slowey to be examples of waste concealment efforts.

3

4   Unless otherwise noted, the quotes below are sourced from:

5  A Proposal for the Investigation of Possible Ground-Water Contamination in The Bangor Area,

6  Kitsap County, Washington. By N.P. Dion. This report was released as part of the cooperative

7  program between the U.S. Department of the Navy and the U.S. Geological Survey, Water

8  Resources Division. Tacoma, Washington. February 6th, 1974.

9

10  November 1970 – An unknown engineer called a halt to that portion of Base operations

11  involving steam expulsion of TNT/RDX and it's related in-ground disposal of effluent, "for fear

12  of damage to the local environment". Dion (1974. p.8).

13  (Slowey inserts here, that later evidence appears to show this work stoppage was temporary. The

14  steam cleaning effluent infiltration area was located on the backside, or West side of the

15  Segregation buildings. This location would later become known as Site F by 1989)

16

17  March 1971 - ..." Representatives of the Navy Bureau of Medicine made a routine inspection of

18  the entire Bangor facility in March 1971, and the possibility of ground-water contamination was

19  discussed at that time. It was agreed that ground-water samples should be taken on a limited

20  scale and analyzed for the presence of TNT/RDX. The samples were collected and sent to a

21  Navy laboratory in Cincinnati, Ohio, where they were analyzed by a technique in which nitrogen

22  compounds, presumably associated with TNT/RDX, were reduced to a form that could be

23  measured colorimetrically (sic). The presence of what was assumed to be TNT/RDX was

24  detected in several widely scattered samples in concentrations as high as 2.0 mg/l (milligrams

COMPLAINT FOR A CIVIL CASE - 10

*Pro Se 1 2022*

1   per liter). However, it should be noted that the colorimetric method is not a specific test for

2   TNT/RDX concentrations, as it indicates the combined concentrations of all nitrogen

3   compounds." ....

4    (Slowey inserts here, that no definition of "widely scattered" was provided in Dion (1974). Nor

5   is it explained how a water sample could be obtained by the Navy prior to drilling of any test

6   wells, when the object of the sampling program was multiple tens of feet below ground level in

7   an active effluent discharge area)

8

9   .... "In July 1971 the Navy expanded the water-sampling program to encompass a larger

10  geographic area. In addition, check samples were sent to a contract laboratory in Santa Fe, N.

11  Me., for verification of the results being obtained by the Navy laboratory in Cincinnati. At the

12  time the Santa Fe laboratory used the same colorimetric technique as the Navy laboratory.

13

14   In August 1971 a preliminary hydrogeological investigation of the study area was completed by

15  the Navy Industrial Environmental Health Center (P.J. Snyder, written commun.,(sic) (undated)

16  but some of the conclusions presented in the report were based in part on several instances of

17  questionable hydrologic reasoning and assumptions.

18

19   By September 1971 the entire TNT/RDX analytic workload had been shifted to the Santa Fe

20  laboratory, which continued using the colorimetric technique." Dion (1974 p.8-9) "...

21  (Slowey inserts here, that he disputes the statements contained in the paragraph quoted below as

22  a fraudulent attempt to deceive U.S. Geological Survey personnel regarding the size of the

23  disposal area and volume of waste and soil removed. Slowey claims an actual size of 400 plus

24  feet by 100 plus feet for the entire disposal area, minus two overflow channels, with a volume of

1  soil/waste excavated of conservatively 5000-7000 cubic yards. Utilizing the waste pit dimension

2  of 30 feet wide and a 3–4-foot excavation depth, should provide a top-end number of 100-104

3  cubic yards of excavated material.  The fact of an attempt was made to "burn" the excavated soil,

4  would seem to indicate it did not consist of soil, as generally dirt isn't flammable, even

5  considering a drier than normal February 1972. A simple explanation for the inconsistencies of

6  the paragraph is the personnel responsible forgot to proofread the cover story, or check the math

7  cited in the cover story, and had no reason to believe Bangor issues would ever be researched in

8  future decades)

9

10  … "In February 1972 the bottom of the disposal pit was excavated to a depth of 3-4 feet. About

11  500 cubic yards of earth was hauled away and several unsuccessful attempts were made to

12  "burn" it. The disposal area was then refilled with trucked-in glacial drift (heterogeneous mixture

13  of sand, gravel, and clay) and soil.

14

15   A close scrutiny of the analytical results from the Santa Fe laboratory revealed that the pattern

16  and timing of groundwater contamination was erratic and unpredictable. This led the Navy to

17  suspect that the sampling and or analytical techniques being used were faulty. In March 1972 the

18  Navy called a meeting of all Army and Navy personnel familiar with the behavior of explosives

19  in water it was pointed out during the meeting that the colorimetric technique being used was not

20  specific for TNT RDX and that a gas-chromatographic technique recently developed by the

21  Naval Ordinance Laboratory (Hoffsommer and Rosen, 1971)  would be more definitive. Shortly

22  thereafter the laboratory in Santa Fe began screening all water samples with the colorimetric

23  technique and analyzing all positive samples with the new gas-chromatographic technique.

24

*Pro Se 1 2022*

1    At the suggestion of concerned Federal, State and County health officials, the Navy once again

2   expanded and intensified the water-sampling program in May 1972. Wells, springs and streams

3   in the Scandia - Bangor - Silverdale area were sampled frequently, at times daily. Emphasis was

4   placed on sampling public water supplies. In addition, samples of tap water "spiked" with known

5   concentrations of TNT/RDX were occasionally sent to the laboratory as a check of the analytical

6   procedures. The spiked samples were detected by the laboratory in the correct concentrations and

7   the incidence of positive values in the water samples did not change. "….. Dion (1974 p.9).

8

9   August 9th, 1972 -  …. " On August 9, 1972, the Navy met with concerned County, State and

10   Federal officials to decide what action should be taken in dealing with the apparent

11   contamination problem. In the course of evaluating the reliability of previous analytical work, a

12   representative of the U.S. Geological Survey, Water Resources Division, presented a brief oral

13   report on the general hydrology and geology of the Bangor area (B.L. Foxworthy, oral

14   commun.). His report casts serious doubt on the validity of previous analytical results and he

15   concluded that contrary to what the analytical results indicated, it was very unlikely that

16   contaminated groundwater could have traveled 4 miles since 1966, a period of about six years

17   and in a direction opposite to the hydraulic gradient. In addition, he drew attention to the almost

18   complete lack of pattern and consistency in the analytical results.

19    On August 18, 1972, the Navy established a gas-chromatographic analytical facility at Keyport,

20   Wash., and began analyzing the water samples there instead of sending them to the contract

21   laboratory in Santa Fe. From that time on, all water samples proved negative to the presence of

22   TNT/RDX except those taken from piezometer number 3 and from water that had been flushed

23   to the cores drilled in the vicinity of the disposal pit. Beginning in the spring of 1973 water

24

COMPLAINT FOR A CIVIL CASE - 13

*Pro Se 1 2022*

1  samples were once again sent to the Navy laboratory in Cincinnati but the results were

2  unchanged." ... Dion (1974 p. 10-11)

3

4  September 1972 – March 1973. Slowey states the Navy created a command identified as, Officer

5  in Charge of Construction (OICC) during a transition phase (PC-5 / OICC Transition) to the

6  public announcement of Bangor as the site of the future Trident Submarine Base. This program

7  was the highest national security priority of the President, and key to the goal of Détente with the

8  Soviet Union. Due to the priority status of the program, there is evidence that managers were

9  instructed to hand-carry documents rather than use normal conveyance, an ideal situation for

10  Bangor contamination issues to be concealed by national security objectives.

11

12  February 16th, 1973 – Slowey states the public was informed of the Bangor site "selection".

13  Kitsap County, a relative backwater county, is suddenly in a froth of massive anticipated

14  economic growth. The starry-eyed dreams of some, and dismayed alarm of others, were proven

15  true by a history of development and population growth.

16   Kitsap residents in the early 1970's had two primary sources of community information, urban

17  lore, and the Bremerton Sun, the local rag of record. The Bremerton Sun was a Trident enthusiast

18  and on one occasion would mock a group of local Trident opponents (C.A.T.). This was an ideal

19  environment for the public to be kept in the dark regarding Bangor practices. Slowey states the

20  interest and wellbeing of the few, were sacrificed for the interest and wellbeing of the many, and

21  the few were not informed of this trade-off.

22

23  April 1973 - ... "In April 1973 Navy personnel at Bangor became aware of a de-milling

24  operation at an army installation in Burlington, Iowa. There, contaminated wastewater is passed

COMPLAINT FOR A CIVIL CASE - 14

Pro Se 1 2022

through an activated carbon filter to remove TNT (only). Even though the water is ultimately disposed of in an open pit, as was done at the Bangor Annex, it was reported that no ground-water contamination has resulted from the Iowa operation. The carbon is then disposed of, usually by open burning.

A pilot plant of a similar but smaller operation was designed and put into operation at the Bangor disposal area on May 22, 1973. A 4- inch well, 60 feet deep and with a 5-foot screen was drilled through the bottom of the disposal pit. The well was equipped with a jet pump and pumped at 9 ½ gpm (gallons per minute) for four days. The water was straw yellow in color as opposed to the blood red color of water with fresh TNT/RDX. The "yellow" water, which contained up to 10 mg/l TNT and 12 mg/l RDX, was passed through carbon filters in which the concentrations of both TNT and RDX were reduced to about 0.05 mg/l.

In early September, the Navy met with representatives of the Environmental Protection Agency, Geological Survey, Washington State Department of Ecology and State and County health authorities to outline plans a full-scale "scrubbing" operation that would attempt to remove any TNT/RDX from the soil directly beneath the disposal pit. The Navy plans for drilling six 6-inch wells 150 feet deep along the axis of the disposal pit. Each would be equipped with this submersible pump capable of delivering about 25 gpm, for a total of about 150 gpm, the water will be collected and passed through a carbon filter, after which will be returned to the pit. As the water percolates down through the soil, additional, TNT/RDX will be leached and the cycle repeated. The scrubbing operation is wholly a Navy project and is completely separate from the Navy-Geological Survey cooperative project discussed in this report" ... Dion (1974) p.11.

COMPLAINT FOR A CIVIL CASE - 15

*Pro Se 1 2022*

(Slowey states, the "scrubbing" operation was specifically designed to dispose of Naval waste by drawing clean, un-contaminated ground-water from a deeper water table separated from the Shallow Aquifer by an impervious soil layer. Carbon filters would serve no purpose other than aesthetics. The still clean water would be passed into the effluent infiltration area for the purpose of leaching TNT/RDX from the sub-soil. Upon reaching the aquifer contained in the sand layer, its downward infiltration would eventually be stopped by an impervious soil layer and forced to flow East / South-East, pass under the Bangor industrial Area, be intercepted by off-Base domestic wells and eventually enter one of the four branches of Clear Creek. The Navy knew, or should have known, the attempt to dispose of very large volumes of explosive effluent would result in long-term human consumption, by unsuspecting local residents such as Slowey, in future decades.

October 1973 - Captain E.R. Stacy, CEC, USN, became the first Officer in Charge of Construction (OICC TRIDENT) 1973 - 1976. The Program and it's 1978 operational objective consisted of three elements, a new class of submarine (U.S.S. Ohio), a new ballistic missile and a new Intigrated Maintenance Facility. None of these elements existed at the time and each represented a challenging sub-set of Program goals. The failure to have a functioning Base would not allow Ohio to be turned over to the Fleet Commander for its first patrol. Bangor and the surrounding Kitsap County area were unsuitable for this sudden basing and maintenance concept and the OICC faced a daunting timeline. The highest priority of the President had no back-up plan should one of the three Trident sub-elements have trouble in forward progress.

The Polaris program had been constructed with 1950's technology, and oldest boats would be nearing the practical end of lifespan when Ohio class boats were anticipated to become

COMPLAINT FOR A CIVIL CASE - 16

*Pro Se 1 2022*

1 operational. It can be demonstrated that senior Naval Officers were concerned that a timely

2 Trident Program roll-out occur.

3

4  The Trident Program faced significant environmentalist and political opposition. A public

5 discovery of hazardous waste concealment could jeopardize the complex political coalition

6 supporting Senator Henry (Scoop) Jackson, a key nuclear fleet supporter, as an example. The

7 Nixon Administration faced both Left and hard Right opposition in Congress of the President's

8 post-Vietnam pivot to Détente and SALT negotiations, allowing little room to lose funding

9 support for such a costly modernization program.

10

11  Slowey alleges the OICC deviated from acceptable construction practices, to conceal pre-

12 existing Base contamination from the public, regulating agencies and visiting VIPs.

13

14 (Slowey states in preparation for his personal injury complaint, he came to believe that such

15 deviations extended beyond merely concealing hazardous waste and extended to defective

16 construction of structures themselves. Specifically, such deviations occurred during construction

17 related to the – [REDACTED]-. While unrelated to the case at hand, Slowey cites this allegation

18 as an apparent pattern of recklessness behavior where a deviation could render a critical structure

19 subject to possible failure during the lifespan of the facility, should a – [REDACTED] - event

20 occur. Such a critical structure failure, like the separate issue of hazardous waste concealment,

21 could also represent a future set of unintended consequences and threats to public safety. If a

22 flawed decision was discovered, the impending Program goals would not allow major

23 corrections, after the fact)

24

COMPLAINT FOR A CIVIL CASE - 17

*Pro Se 1 2022*

1  September 1974 - ... "By September of 1974, the OICC TRIDENT advertised the first

2  construction contract and by November had the first results to show from its presence – (sic)  the

3  demolition of an old building at Bangor in a large hole in the ground which would house the

4  foundation for the TRIDENT Training Facility. From then on things developed rapidly with

5  construction and also with the increasing number of visitors to the site.  "It was so nice to have

6  some construction underway to show people such as the Secretary of the Navy and others".

7  recalls CDR Dunn. (sic)    Official written record made on the watch of Captain J.W. Weir, Jr.,

8  CEC, USN OICC TRIDENT 1976- circa 1978. Quote from CDR J.R. Dunn, CEC, USN Deputy

9  (1973-1976)

10

11  Slowey states the first Trident construction contract was for clearing, excavation and foundation

12  work for the Trident Training Facility (TriTraFac.) The current TriTraFac is the actual site where

13  the FML, it's associated rail loop and rail dock once stood. The TriTraFac basement excavation

14  was how the soils and building rubble from the FML were removed from an active nuclear

15  weapons facility and deposited in the Mountain View Road Pile. The materials were offered to

16  off-Base residents as free fill, with no mention of mercury in the rubble or soil. This first contract

17  was of the highest priority to the Navy and superseded the advertisement for construction

18  contracts related to the Weapons Handling Wharf.

19   With the former de-milling site (later designated Site F) concealed by trucked in fill-dirt, the

20  focus was on making the FML disappear before the Secretary of the Navy, and other VIPs

21  arrived. Based on descriptions of the FML, a reasonable assumption would include many

22  thousands of cubic yards of soil, if not tens of thousands would need excavation due to the

23  extreme danger of friable mercury residue created by its demolition.

24

COMPLAINT FOR A CIVIL CASE - 18

*Pro Se 1 2022*

1    Circa 1974 - The Slowey family relocated to Kitsap County when Plaintiff's father obtained

2    work on-Base work in support of Trident construction. Slowey recalls an incident when his

3    father returned from work and claimed he had been instructed by an Admiral to destroy records.

4    He referred to the Admiral as "evil" and that evidence had to be preserved. While Slowey

5    believed his father's account to be truthful, he did not believe it to have any current or future

6    relevance in his life as high school student. Slowey now believes the alleged order to destroy

7    records was a key factor to his later 2016 diagnosis, but at the time did not understand the issues

8    being raised by his father.

9

10   Circa 1974 – The U.S. Navy – U.S. Geological Survey cooperative program, progresses in three

11   phases.

12    In phase I, the initial step, the Geological Survey would (1) draft a statement of the problem, (2)

13   define the scope of the entire study (including Phases II and III), (3) specify the study output, and

14   (4) provide and estimate of the time involved.

15

16   Phase II would define the area and degree of present contamination and project future movement

17   in the environment. Either in Phase II, or as early as possible in Phase III, recommendation

18   would be made as to the practicability and need for a mathematical predictive model of the

19   movement of TNT/RDX in the area.

20

21   During these three phases, all data appears to be Navy supplied. One site visit to the de-milling

22   site occurs by Dion in late 1974. A diagram is drawn with its original dimensions and description

23   used by Slowey to calculate a minimum of 5000-7000 cubic yards of waste excavated from the

24   site in early 1974.

COMPLAINT FOR A CIVIL CASE - 19

Summer 1974 -1977 - Concerned About Trident (C.A.T.), a local community group prepares to file suit over the adequacy of the Trident Environmental Impact Statement. Slowey states the Navy kept C.A.T. and the Courts in the dark regarding the facts on the ground, in an effort to cause the Courts to believe the Navy was acting in good faith. There is no evidence that any information regarding Bangor contamination came to light during the discovery or proceedings phase of this case.

August 1977 – Residents notice a military contractor dumping large amounts of Trident waste near Mountain View Road (the Pile). There is evidence of minor residents becoming ill at this location.

1986 – Legislation is moving through Congress that will affect Bangor and result in placement on the National Priority List.

July 31st, 1986 – Starrett v. United States is filed and progresses to the 9th Circuit Court of Appeals. Starrett (last house on North side of Mountain View Road) alleged de-milling waste from Site F traveling under their property and entered their domestic well. Slowey states the Navy discovered a massive multi-year gasoline leak, North of Starrett, but did not appear to disclose during trial. Starrett also appears to have possessed no knowledge of their property bordering an industrial sewer leach-field, associated with the old Bangor Industrial Area. This would be designated Site 25 and Operable Unit 8 after the in suite in 1989. Mid-1990's documents would later reveal the Industrial Sewer (Site 25) had an outflow that discharged contaminates onto the Starrett property and flowed South via seasonally intermittent ditch that

*Pro Se 1 2022*

1  transitioned into a year-round stream. This ditch was the headwaters of one of four Clear Creek

2  branches. Documents claim that a "middle" branch was followed and returns for sediment

3  contamination found until the stream intersected the "main" branch. Slowey states, he believes

4  this to be another botched environmental survey and individuals taking the sediment samples

5  were confused about what stream branch they were following because there is no middle branch.

6   Regardless of whatever ambiguity is contained in Naval documents, Slowey states Starrett was

7  very correct in their assertion of well contamination, and the 1990's documents reveal not just a

8  contaminated well, but stream sediment contamination extending at least a mile south of their

9  property. These positive contamination returns could still be obtained approximately eight years

10 after Starrett's initial filing, and sixteen years after Slowey believes the Industrial Sewer was

11 decommissioned and replaced by a sewer main to a Kitsap County operated Brownsville plant.

12  Slowey consistently states that water contamination spread a substantial distance off-Base.

13

14

15 1987 – The Navy purportedly searches for the FML, and positive mercury detection occurs. The

16 search appears botched and it could not be determined where these positive mercury results were

17 obtained.

18

19 1988 – Hart Crowser 1988, an environmental study, identifies Site F along with Site A (a related

20 dumpsite / incineration-site at the northern edge of the Base, near Vineland).

21

22 1989 – Hart Crowser 1989 – This follow-up situation report describes the environmental status

23 of the remaining portions of Bangor. Slowey states the Navy supplied data used to create Hart

24

Pro Se 1 2022

Crowser 1988-1989 was flawed, and these flaws have been copy / pasted into all subsequent

environmental reports, as they served as the basis for all later environmental cleanup actions.


1994 – 2010's - A newly drilled well (Donna Wright Well) is found during a standard Kitsap

County Health Department new well permit test, to contain gasoline and ultimately, numerous

other volatile organic compounds (VOC). The well was located on property immediately

adjacent to Starrett's east property line, on the northern side of Mountain View Rd. This

discovery resulted in substantial environmental reporting and cleanup activities through the

1990's and 2000's, both on and off-Base. Operable Unit 8 was extended onto private property

with Clear Creek Rd. utilized as an eastern boundary, and Mountain View Rd. serving as a

southern boundary, The Navy assured off-Base residents of their safety throughout this era.


Fall 2023 – Slowey becomes aware of certain per- and polyfluoroalkyl substances (PFAS)

contaminating his well, and begins a process of obtaining further information from historical

documents and residents' memories. While preparing for his filing deadline, Slowey learns his

well is only +/- 275 feet from an artesian spring and outflow located on the State Route 3 right of

way, and by extension, also would have contributed to the eastward travel of ground-water to the

vicinity of his well from Bangor. As of February 17th, 2026, Slowey is aware of no effort to

identify health effects of past waste discharge practices on residents.


### III.    RELIEF

*State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.*

COMPLAINT FOR A CIVIL CASE - 22

*Pro Se 1 2022*

1    <u>Slowey request $3,375,000 identified on his original administrative filing. Slowey's</u>

2    <u>subsequent Parkinsons diagnosis was after-discovered information, and he can offer no opinion</u>

3    <u>here regarding the direction and prognosis of this additional disease condition, other then state</u>

4    <u>his is in an ongoing condition of decline, pain and suffering.</u>

5    _____

6    _____

7    ### IV.    CERTIFICATION AND CLOSING

8    Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my

9    knowledge, information, and belief that this complaint: (1) is not being presented for an improper

10    purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

11    (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or

12    reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so

13    identified, will likely have evidentiary support after a reasonable opportunity for further

14    investigation or discovery; and (4) the complaint otherwise complies with the requirements of

15    Rule 11.

16    I agree to provide the Clerk's Office with any changes to my address where case-related

17    papers may be served. I understand that my failure to keep a current address on file with the

18    Clerk's Office may result in the dismissal of my case.

19    Date of signing:            *November 16, 2006*

20    Signature of Plaintiff      *Lee L. Slowey*

21    Printed Name of Plaintiff   *LEE A. SLOWEY*

22

23    Date of signing:            _____

24    Signature of Plaintiff      _____

COMPLAINT FOR A CIVIL CASE - 23

*Pro Se 1 2022*

1

Printed Name of Plaintiff    _____

2

3     Date of signing:    _____

4     Signature of Plaintiff    _____

5     Printed Name of Plaintiff    _____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT FOR A CIVIL CASE - 24